The Honorable Harmon R. Seawel State Representative 5761 Hwy. 328 West Pocahontas, AR 72455-8661
Dear Representative Seawel:
I am writing in response to your request for my opinion on a question I will paraphrase as follows:
 Would a proposed development project under the TIF Act of 2001, because of revenue distortions to local taxing entities, decrease funding for the Pocahontas School District?
You report that officials of the Pocahontas School District "have been told by the developers' attorney that a special set aside fund will keep the district from being adversely effected [sic]."
RESPONSE
In my opinion, when a locality forms a redevelopment district pursuant toAct 1197 of 2001, enacted pursuant to Ark. Const. amend. 78 and currently codified at A.C.A. § 14-168-301 to -322 (Supp. 2001), assuming the project increases the overall value of properties contained within the district, the inevitable effect of tax incremental financing ("TIF") of the project costs will be to decrease school tax finances that would otherwise have been available to the school district. The legislation makes no reference to a "special set aside fund" of the sort you report the developers' attorney assures will offset such decreases. Since I know nothing about this proposed fund, I cannot opine regarding its effects.
I am enclosing for your information a copy of Ark. Op. Att'y Gen. No.2001-295, in which one of my predecessors discussed in detail the possible effects upon school district financing of a local government's establishing a redevelopment district to be funded by "tax incremental financing" — i.e., the retirement of redevelopment project debt using the incremental increase in property taxes over time. I will not here reproduce my predecessor's detailed and accurate analysis focusing on the mechanics of such financing. However, I will summarize those of my predecessor's conclusions that appear to bear most directly on your request.
Amendment 78 authorizes the creation of redevelopment districts to improve "blighted areas." The legislation enabling the implementation of Amendment 78 is codified at A.C.A. § 14-168-301 to -3222 (Supp. 2001). Subsection 1(d) of Amendment 78 provides:
 The General Assembly may provide that the ad valorem taxes levied by any taxing unit, in which is located all or part of an area included in a redevelopment district, may be divided so that all or part of the ad valorem taxes levied against any increase in the assessed value of property in the area obtaining after the effective date of the ordinance approving the redevelopment plan for the district shall be used to pay any indebtedness incurred for the redevelopment project; provided, however, there shall be excluded from the division all ad valorem taxes for debt service approved by voters in a taxing unit prior to the effective date of this amendment.
(Emphasis added.) Subsection 14-168-301(16) of the Code defines the term "taxing unit" to mean "any city, county, school district, or community college district."
As discussed at length in Opinion 2001-295, it is the effect of Amendment 78 to divert incremental increases in ad valorem property taxes from school uses to debt service for redevelopment projects. As my predecessor observed:
 Under Amendment 78 the General Assembly is authorized to divert" all" or a part of the ad valorem taxes levied by any" taxing unit" to fund the redevelopment district. Clearly, a school district is a "taxing unit" for purposes of this provision. Cf. Frank v. Barker, 341 Ark. 577, 20 S.W.3d 293 (2000) (school district was clearly a "taxing unit" for purposes of Amendment 59 even though its territory spanned two or more counties). The enabling legislation for Amendment 78, passed as Act 1197 of 2001 and now codified at A.C.A. §§ 14-168-301 to 322 (Supp. 2001), specifically defines the term "taxing unit" as including school districts. See A.C.A. § 14-168-301 (16). In my opinion, therefore, the enabling legislation clearly authorizes the diversion of some school tax revenues to support a redevelopment district. There is no question, in my opinion, that Amendment 78 was intended to supersede the provisions of Arkansas Constitution, art. 14, § 2 to the contrary. In my opinion, in light of the history of redevelopment financing laws in Arkansas and their dubious constitutionality, as expressed in Op. Att'y Gen 89-264, the general repealer clause of Amendment 78 was intended, at least in part, to overrule any conflict with provisions guaranteeing that school taxes only be used for school purposes. It was necessary to pass a constitutional amendment to authorize such redevelopment districts for the primary reason that existing restrictions on the expenditure of school revenues prevented the statutory creation of such districts. See again, Op. Att'y Gen. 89-264.
I will not reproduce the analysis in Opinion 2001-295 regarding the separate question of whether the state might be considered a "taxing unit" within the contemplation of Amendment 78, thus possibly bringing within the scope of Amendment 78 the 25-mill uniform rate of tax for maintenance and operation of the schools imposed pursuant to Ark. Const. amend. 74. I will merely quote the following conclusion, with which I fully concur:
 [T]he "total ad valorem rate" is defined as including "the total millage rate of all county, city, school, or other local general property taxes. . . ." There might be room for an argument, therefore, that this definition excludes the taxes levied by Amendment 74 based on the assertion that Amendment 74 does not levy a "local general property tax." (Emphasis added). Although the uniform rate may indeed be characterized as a "school . . . tax" it may not be as easily designated a "local" one. On the other hand, it may be asserted that Amendment 78 and its enabling legislation refer comprehensively to "all" ad valorem taxes and to the "total millage rate" of school districts, thus evidencing an intention to include all school taxes, including the uniform rate of tax.
 . . . I must note, however, that Amendment 78 invests the General Assembly with significant discretion to adopt enabling legislation and provides that it may authorize the division of "all" or "part" of ad valorem taxes in a redevelopment district. The General Assembly is invested with discretion as to the appropriate legislative scheme, but has simply not spoken unequivocally in the current legislation.
I will not reproduce my predecessor's cogent analysis of the practical and constitutional issues that might attend any diversion from school district purposes of revenues realized from the uniform rate of tax. Whatever the appropriate treatment of the uniform rate of tax, Amendment 78 clearly anticipates diverting funds from the general category of school tax revenues to redevelopment projects. It follows that the formation of a TIF redevelopment district would necessarily decrease funding available to a school district.
You somewhat cryptically report that the developers' attorney proposes avoiding this adverse effect by establishing a "special set aside fund." Neither Amendment 78 nor its enabling legislation mentions any such fund, and I cannot determine from your question what revenues the developer proposes to put in the fund. I consequently cannot opine whether the proposed fund would offset revenue loss to the school district caused by the formation of a TIF redevelopment district.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JD/cyh